IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF SOUTH CAROLINA
AIKEN DIVISION

| | | |
|---|---|---|
| Louise Johnson, | ) | C/A No.: 1:12-3277-SB-SVH |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | REPORT AND RECOMMENDATION |
| Carolyn W. Colvin, Acting | ) | |
| Commissioner of Social Security | ) | |
| Administration,[1] | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

This appeal from a denial of social security benefits is before the court for a Report and Recommendation ("Report") pursuant to Local Civil Rule 73.02(B)(2)(a) (D.S.C.). Plaintiff brought this action pursuant to 42 U.S.C. § 405(g) and § 1383(c)(3) to obtain judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying her claim for Disability Insurance Benefits ("DIB") and Supplemental Security Income ("SSI"). The two issues before the court are whether the Commissioner's findings of fact are supported by substantial evidence and whether she applied the proper legal standards. For the reasons that follow, the undersigned recommends that the Commissioner's decision be affirmed.

---

[1] Carolyn W. Colvin became the Acting Commissioner of Social Security on February 14, 2013. Pursuant to Fed. R. Civ. P. 25(d), Carolyn W. Colvin is substituted for Commissioner Michael J. Astrue as the defendant in this lawsuit.

I.    Relevant Background

A.    Procedural History

Plaintiff filed applications for DIB and SSI on January 7 and January 25, 2010, respectively, in which she alleged her disability began on January 15, 2000. Tr. at 123–29. Her applications were denied initially and upon reconsideration. Tr. at 50–51, 54–55. On May 19, 2011, Plaintiff had a hearing before Administrative Law Judge ("ALJ") Marcus Christ. Tr. at 24–49 (Hr'g Tr.). The ALJ issued an unfavorable decision on June 10, 2011, finding that Plaintiff was not disabled within the meaning of the Act. Tr. at 10–19. Subsequently, the Appeals Council denied Plaintiff's request for review, making the ALJ's decision the final decision of the Commissioner for purposes of judicial review. Tr. at 1–3. Thereafter, Plaintiff brought this action seeking judicial review of the Commissioner's decision in a complaint filed on November 15, 2012. [Entry #1].

B.    Plaintiff's Background and Medical History

1.    Background

Plaintiff was 48 years old at the time of the hearing. Tr. at 128. She graduated from high school. Tr. at 32. Her past relevant work ("PRW") was as a bookkeeper and as a basket assembler. Tr. at 44. She alleges she has been unable to work since January 15, 2000. Tr. at 128.

2.    Medical History

On June 7, 2001, Plaintiff presented to Dr. Paul Underwood of the Medical University of South Carolina ("MUSC") and reported weight loss, no appetite, excessive crying while at home, and being under tremendous familial stress. Tr. at 205. She

reported working as a secretary. *Id.* On examination, Plaintiff was obviously depressed, hung her head low, became teary eyed, and admitted to feeling depressed. Tr. at 206. Dr. Underwood noted that he discussed these depressive symptoms at length with Plaintiff and that she wanted help, but not counseling. *Id.* He prescribed Zoloft and advised Plaintiff to return if the medication did not help. *Id.*

In December 2002, EMS transported Plaintiff to the emergency room ("ER") after police found her at home acting bizarrely, stating that demons were possessing her home, that she was starting fires in an attempt to get rid of them, that the TV spoke to her and she was able to broadcast back to the TV, and that she was the Queen of Africa and Louis Armstrong's niece. Tr. at 185. She was involuntarily admitted to psychiatric hospitalization for approximately three weeks. Tr. at 185, 190–92. During her hospitalization, she "slowly came back to baseline and became more appropriate" with the help of psychotropic medication. Tr. at 192. A brain MRI and EEG taken at the time were normal. Tr. at 197, 203. Plaintiff was discharged with a diagnosis of bipolar disorder and a global assessment of functioning ("GAF")[2] score of 50. Tr. at 192.

Office treatment records from Charleston Mental Health ("CMH")[3] indicate that Plaintiff received treatment for bipolar disorder and major depressive disorder with psychotic features in 2003, including in January, March, April, July, August, September,

---

[2] "Clinicians use a GAF to rate the psychological, social, and occupational functioning of a patient." *Morgan v. Comm'r of Soc. Sec. Admin.*, 169 F.3d 595, 597 n. 1 (9th Cir. 1999).

[3] Due to poor copying, these treatment records are difficult to read.

October, and December.  Tr. at 292–93, 291, 290, 289, 288.  This treatment continued in 2004, including in January, March, April, July, and October.  Tr. at 287, 286, 285, 283.

In March 2003, Plaintiff reported to a treating psychiatrist that her mood was "fine," her thoughts were "clear," and her psychotropic medication was helpful and causing no problematic side effects.  Tr. at 291.  In August 2003, Plaintiff told the psychiatrist that she was "doing real well," with "OK" energy and a good mood, but reported significant stressors related to her mother's recent cancer diagnosis.  Tr. at 289.

In October 2003, Plaintiff reported that her mother had passed away the prior month.  Tr. at 288.  In December 2003, she reported that her mood and energy level were "OK," and she denied psychotic symptoms.  *Id.*  In January 2004, Plaintiff reported that things were going well and that she had "great holidays" with visiting family.  Tr. at 287. The treating psychiatrist judged that she had been able to grieve her mother's death without any complications.  *Id.*

In April 2004, Plaintiff stated that she was doing well, her medication was helping, and she felt "back to normal" with no fears or phobias.  Tr. at 286.  In October 2004, Plaintiff reported that she was "doing OK" with no psychological complaints.  Tr. at 283.

On September 28, 2007, Plaintiff was involuntarily admitted to MUSC after proclaiming, "I am the Lord."  Tr. at 199–200.  Plaintiff was agitated, psychotic, and aggressive in the ER.  Tr. at 199.  She was noted to be bipolar and manic.  Tr. at 200. There is no indication in the record as to how long Plaintiff remained in inpatient status. [Entry #19 at 7, n.3].

4

In November 2008, Plaintiff was seen at CMH after missing a few appointments. Tr. at 274.  She was noted to have good energy, good sleep, and a good mood, except in the context of stressors.  *Id.*  She was also observed to have an animated and bright affect. *Id.*

At a January 2008 mental health appointment, the treating source noted that Plaintiff was pleasant and exhibited "goal-directed" and "linear" thoughts.  Tr. at 293.

At an April 2008 mental health examination, Plaintiff's only complaint was that she felt frustrated because she had not been paid for babysitting she had done.  Tr. at 276. The treating psychiatrist noted that there was no evidence of psychosis, and that Plaintiff was cooperative and goal-directed, with an apparently euthymic mood.  *Id.*

On November 21, 2008, Plaintiff's symptoms targeted for treatment were depression, mental/hypomania, and sleep and appetite disturbances.  Tr. at 219.  Plaintiff reported that she had a good relationship with her boyfriend, was still making baskets, and was socializing more.  *Id.*  It was noted that she exhibited an "animated, bright affect" and her mental status examination was normal.  *Id.*  Dr. Patricia N. Noadi assessed a GAF score of 65 and opined that continued treatment was needed to prevent decompensation, but not to address unstable symptoms or any need to improve her level of functioning or to prevent hospitalization.  Tr. at 220.

Plaintiff continued treatment for the same symptoms on March 10, 2009, and reported feeling stiff upon waking from sleep.  Tr. at 221.  She also reported having a decreased appetite from worry, including about finances, as her cost of living had increased with her brother living with her.  *Id.*  She denied a depressed mood and was

"[a]nimated and jocular at times." *Id.* Her mental status examination was normal and she was assessed with a GAF score of 60. *Id.*

In May 2009, Plaintiff's mental status examination was again normal, and she reported that she had no stressors and that she still wove baskets for leisure and for "limited sales." Tr. at 223. It was noted that she remained isolative with limited social contact outside of family. *Id.* Dr. Noadi assessed Plaintiff with a GAF score of 52. Tr. at 224.

On October 20, 2009, Plaintiff saw Dr. Ajay V. Sood and reported that she was doing well, with "no significant issues" and no side effects from medication. Tr. at 225. She rated her mood as eight on a ten-point scale. *Id.* She stated that she was attending church and still weaving baskets. *Id.* Her mental status examination was again normal, and Dr. Sood assessed her with a GAF score of 55. *Id.*

In January 2010, Plaintiff returned to Dr. Sood, who noted that Plaintiff was "[d]oing well" with "[n]o issues with current medications." Tr. at 227. Plaintiff's mental status examination was normal. *Id.* Dr. Sood assessed Plaintiff with a GAF score of 45. Tr. at 228.

On March 4, 2010, Plaintiff stated that, on most days, she spent about seven hours per day weaving baskets. Tr. at 230. She cooked two meals per day, and said she could concentrate well enough to read a book "clear through." *Id.* She described herself as "pretty much stable" and said that her medication worked well. *Id.* She denied panic attacks or "outbursts." *Id.* In the second half of 2010, Plaintiff stated that she could care for herself (Tr. at 176), had no problem with personal hygiene, cooked the household

meals, did the household chores, wove baskets "to earn a little money," was capable of handling her own funds, and had no problems getting along with people (Tr. at 172).

On March 19, 2010, state-agency consultant Lisa Varner opined that Plaintiff had bipolar disorder, but no limitations.  Tr. at 231–44.

On June 8, 2010 Plaintiff reported to Dr. Sood at CMH noting that she felt alone since a few of her friends had died.  Tr. at 253.  Her mental status examination was normal and Dr. Sood assessed her with a GAF score of 45.  Tr. at 254.

In August 2010, state-agency consultant Holly Hadley, Psy.D., opined that Plaintiff had bipolar disorder and a history of marijuana use and alcohol abuse.  Tr. at 259–72.  Dr. Hadley further opined that Plaintiff had mild restriction of activities of daily living ("ADLs"); mild difficulties maintaining social functioning; mild difficulties maintaining concentration, persistence, or pace; and no episodes of decompensation.  Tr. at 269.

In September 2010, Plaintiff was "doing fair" and reported that she "had fun" at a wedding.  Tr. at 295.  Her mental status examination was again normal and Dr. Sood assessed her with a GAF score of 45.  Tr. at 296.  In March 2011, Dr. Sood again noted that Plaintiff was doing fair and had a GAF score of 45.  Tr. at 297–98.

C.      The Administrative Proceedings

1.      The Administrative Hearing

a.      Plaintiff's Testimony

At the hearing on May 19, 2011, Plaintiff testified that she experienced her first episode of mental decompensation sometime in 2000 or 2001 when she thought she was

Cleopatra and cut off all of her hair.  Tr. at 28.  She said that, since then, she had been doing better and that medication helped a great deal.  Tr. at 28–29.  She stated that she received mental health treatment on a quarterly basis including counseling and medication.  Tr. at 29.  She reported that she spent her time weaving baskets at home to make a little money to help her pay her bills and reduce her stress level, that she lived alone, and that her family members assisted her financially and checked on her to make sure she was okay.  *Id.*

Plaintiff testified that she did not think she could go back to work because, at times, she became confused, was not herself, and was afraid of acting out again.  Tr. at 30.  She indicated that she was able to go to the store, but that being around people scared her sometimes.  *Id.*  She said that she was doing "pretty well" on her medications, but that the side effects included stiffness in her joints, occasional involuntary twisting motions, and occasional tremors.  Tr. at 30–31.  She explained that these side effects had recently started and that she planned to report them to mental health.  Tr. at 31.  She stated that she saw her sister about three times per week.  *Id.*

Plaintiff testified that she lived alone, was never married, and was able to take care of the house and do the dishes.  Tr. at 32.  She stated that she previously worked as the assistant bookkeeper in a grocery store check cashing office for about 13-and-a-half years.  Tr. at 32–34.  She explained that she was fired from this position for making a mistake, but that there were things going on with coworkers that she was unable to handle, including bullying.  Tr. at 33.  She testified that she was a basket weaver and

performed this activity at home. Tr. at 34. She explained that she sold the baskets wholesale to a person who sold them at the market for a profit. *Id.*

> b.  Testimony of Plaintiff's Sister

Plaintiff's sister, Sara Managalt, testified that she believed Plaintiff was doing somewhat better on her medications, but that, without medication, Plaintiff would have episodes during which she refused to communicate with others. Tr. at 38. Ms. Managalt opined that Plaintiff's quiet, stress-free lifestyle was helpful to her condition, and that going back out to work might exacerbate her condition. Tr. at 38–39. Ms. Managalt feared that if Plaintiff underwent the stress of returning to work, she might have a nervous breakdown and hurt someone. Tr. at 39. Ms. Managalt explained that she observed Plaintiff become irritable and appear as though she still might have been hearing voices. Tr. at 40.

> c.  Vocational Expert Testimony

Vocational Expert ("VE") Art Schmidt reviewed the record and testified at the hearing. Tr. at 44. The VE categorized Plaintiff's PRW as a bookkeeper as sedentary, skilled work and her other past relevant work as a basket assembler as light, unskilled work. *Id.* The ALJ described a hypothetical individual of Plaintiff's vocational profile who had no exertional limitations, but would need to avoid moderate exposure to excessive noise and vibration; could perform simple, routine, and repetitive tasks with only occasional changes in the work setting; could perform no production-rate or pace work; and could only occasionally interact with the public and with coworkers. *Id.* The VE testified that the hypothetical individual could perform Plaintiff's PRW as a basket

weaver.  Tr. at 44–45.  The VE stated that she could also perform the jobs of laundry operator, tobacco sample puller, and coupon recycler.  Tr. at 45.  The VE testified that, even if the hypothetical individual had to work in essential isolation with only occasional supervision, she would be able to perform the jobs of tobacco sample puller and coupon recycler, as well as the job of inspector.  Tr. at 46.  While the VE testified that the jobs of tobacco sample puller and coupon recycler could be done in complete isolation, he stated that the individual would need to talk to a supervisor at some point.  Tr. at 46–47.  He stated that there would be no jobs available for someone who missed more than three days of work per month, who was unable to complete tasks for twenty percent of the day, or whose behavior caused problems on the job in terms of an inability to interact with supervisors and coworkers because of confrontations and other similar difficulties.  *Id.*

2.     The ALJ's Findings

In his decision dated June 10, 2011, the ALJ made the following findings of fact and conclusions of law:

1.     The claimant meets the insured status requirements of the Social Security Act through March 31, 2005.
2.     The claimant has not engaged in substantial gainful activity since January 15, 2000, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).
3.     The claimant has the following severe impairment: bipolar disorder/affective disorder (20 CFR 404.1520(c) and 416.920(c)).
4.     The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).
5.     After careful consideration of the entire record, I find that the claimant has the residual functional capacity to perform a full range of work at all exertional levels but with the following non-exertional limitations: she must avoid moderate exposure to excessive noise and vibration; she can perform

only simple, routine and repetitive tasks; and she is limited to an occupation that involves only occasional changes in the work setting. Additionally, she cannot perform production-rate or paced work and should be limited to working in essential isolation with only occasional supervision.

6.     The claimant is capable of performing past relevant work as a basketweaver. This work does not require the performance of work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7.     The claimant has not been under a disability, as defined in the Social Security Act, from January 15, 2000, through the date of this decision (20 CFR 404.1520(f) and 416.920(f)).

Tr. at 12–18.

## II.     Discussion

Plaintiff alleges the Commissioner erred for the following reasons:

1)     the ALJ erred at steps two and three of the sequential evaluation process;

and

2)     the ALJ erred in his credibility determination.

The Commissioner counters that substantial evidence supports the ALJ's findings and that the ALJ committed no legal error in his decision.

### A.     Legal Framework

#### 1.     The Commissioner's Determination-of-Disability Process

The Act provides that disability benefits shall be available to those persons insured for benefits, who are not of retirement age, who properly apply, and who are under a "disability." 42 U.S.C. § 423(a). Section 423(d)(1)(A) defines disability as:

the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for at least 12 consecutive months.

11

42 U.S.C. § 423(d)(1)(A).

To facilitate a uniform and efficient processing of disability claims, regulations promulgated under the Act have reduced the statutory definition of disability to a series of five sequential questions. *See, e.g., Heckler v. Campbell*, 461 U.S. 458, 460 (1983) (discussing considerations and noting "need for efficiency" in considering disability claims). An examiner must consider the following: (1) whether the claimant is engaged in substantial gainful activity; (2) whether she has a severe impairment; (3) whether that impairment meets or equals an impairment included in the Listings;[4] (4) whether such impairment prevents claimant from performing PRW;[5] and (5) whether the impairment prevents her from doing substantial gainful employment. *See* 20 C.F.R. §§ 404.1520, 416.920. These considerations are sometimes referred to as the "five steps" of the Commissioner's disability analysis. If a decision regarding disability may be made at any step, no further inquiry is necessary. 20 C.F.R. §§ 404.1520(a)(4) and 416.920(a)(4)

---

[4] The Commissioner's regulations include an extensive list of impairments ("the Listings" or "Listed impairments") the Agency considers disabling without the need to assess whether there are any jobs a claimant could do. The Agency considers the Listed impairments, found at 20 C.F.R. part 404, subpart P, Appendix 1, severe enough to prevent all gainful activity. 20 C.F.R. § 404.1525. If the medical evidence shows a claimant meets or equals all criteria of any of the Listed impairments for at least one year, she will be found disabled without further assessment. 20 C.F.R. §§ 404.1520(a)(4)(iii), 416.920(a)(4)(iii). To meet or equal one of these Listings, the claimant must establish that her impairments match several specific criteria or be "at least equal in severity and duration to [those] criteria." 20 C.F.R. §§ 404.1526, 416.926; *Sullivan v. Zebley*, 493 U.S. 521, 530 (1990); *see Bowen v. Yuckert*, 482 U.S. 137, 146 (1987) (noting the burden is on claimant to establish his impairment is disabling at Step 3).

[5] In the event the examiner does not find a claimant disabled at the third step and does not have sufficient information about the claimant's past relevant work to make a finding at the fourth step, he may proceed to the fifth step of the sequential evaluation process pursuant to 20 C.F.R. §§ 404.1520(h), 416.920(h).

(providing that if Commissioner can find claimant disabled or not disabled at a step, Commissioner makes determination and does not go on to the next step).

A claimant is not disabled within the meaning of the Act if she can return to PRW as it is customarily performed in the economy or as the claimant actually performed the work. *See* 20 C.F.R. Subpart P, § 404.1520(a), (b); § 416.920(a), (b), Social Security Ruling ("SSR") 82–62 (1982). The claimant bears the burden of establishing her inability to work within the meaning of the Act. 42 U.S.C. § 423(d)(5).

Once an individual has made a prima facie showing of disability by establishing the inability to return to PRW, the burden shifts to the Commissioner to come forward with evidence that claimant can perform alternative work and that such work exists in the regional economy. To satisfy that burden, the Commissioner may obtain testimony from a VE demonstrating the existence of jobs available in the national economy that claimant can perform despite the existence of impairments that prevent the return to PRW. *Walls v. Barnhart*, 296 F.3d 287, 290 (4th Cir. 2002). If the Commissioner satisfies that burden, the claimant must then establish that she is unable to perform other work. *Hall v. Harris*, 658 F.2d 260, 264–65 (4th Cir. 1981); *see generally Bowen v. Yuckert*, 482 U.S. 137, 146 n.5 (1987) (regarding burdens of proof).

### 2.     The Court's Standard of Review

The Act permits a claimant to obtain judicial review of "any final decision of the Commissioner [] made after a hearing to which he was a party." 42 U.S.C. § 405(g). The scope of that federal court review is narrowly-tailored to determine whether the findings of the Commissioner are supported by substantial evidence and whether the

Commissioner applied the proper legal standard in evaluating the claimant's case. *See Richardson v. Perales*, 402 U.S. 389, 390 (1971); *Walls*, 296 F.3d at 290 (*citing Hays v. Sullivan*, 907 F.2d 1453, 1456 (4th Cir. 1990)).

The court's function is not to "try these cases de novo or resolve mere conflicts in the evidence." *Vitek v. Finch*, 438 F.2d 1157, 1157–58 (4th Cir. 1971); *see Pyles v. Bowen*, 849 F.2d 846, 848 (4th Cir. 1988) (*citing Smith v. Schweiker*, 795 F.2d 343, 345 (4th Cir. 1986)). Rather, the court must uphold the Commissioner's decision if it is supported by substantial evidence. "Substantial evidence" is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson*, 402 U.S. at 390, 401; *Johnson v. Barnhart*, 434 F.3d 650, 653 (4th Cir. 2005). Thus, the court must carefully scrutinize the entire record to assure there is a sound foundation for the Commissioner's findings and that her conclusion is rational. *See Vitek*, 438 F.2d at 1157–58; *see also Thomas v. Celebrezze*, 331 F.2d 541, 543 (4th Cir. 1964). If there is substantial evidence to support the decision of the Commissioner, that decision must be affirmed "even should the court disagree with such decision." *Blalock v. Richardson*, 483 F.2d 773, 775 (4th Cir. 1972).

    B.    Analysis

        1.    Steps Two and Three

Plaintiff asserts that the ALJ did not properly employ the special technique used for assessing mental impairments because: (1) he did not acknowledge the psychotic features of her mental illness at step two, and (2) did not consider Listing 12.03 (Schizophrenic, Paranoid, and Other Psychotic Disorders) at step three, including

14

Plaintiff's alleged need for a highly supportive living arrangement in light of the psychotic nature of her illness. [Entry #19 at 12].

a.    Step Two

At step two, the ALJ found Plaintiff had the following severe impairments: bipolar disorder/affective disorder. Tr. at 12. Plaintiff contends that the ALJ erred in failing to acknowledge the psychotic features of her mental illness. [Entry #19 at 12]. Plaintiff notes that where a claimant has multiple impairments, "the adjudicator must evaluate the combined impact of those impairments on an individual's ability to function." *Id.* The Commissioner responds that the ALJ did not err at step two because Plaintiff's psychotic features do not meet the twelve-month durational requirement set forth in 20 C.F.R. §§ 404.1509, 416.909. [Entry #21 at 8]. The Commissioner further argues that even if the ALJ did err at step two, any such error was harmless because he proceeded to the subsequent steps of the disability process. *Id.* at 9.

A severe impairment is one that "significantly limits [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. § 404.1520(c). A non-severe impairment is defined as one that "does not significantly limit [a claimant's] physical or mental ability to do basic work activities." 20 C.F.R. §§ 404.1521(a), 416.921(a). A severe impairment "must result from anatomical, physiological, or psychological abnormalities which can be shown by medically acceptable clinical and laboratory diagnostic techniques. A physical or mental impairment must be established by medical evidence consisting of signs, symptoms, and laboratory findings, not only by your statement of symptoms[.]" 20 C.F.R. §§ 404.1508, 416.908. It is the claimant's burden

15

to prove that she suffers from a medically-severe impairment. *Bowen v. Yuckert*, 482 U.S. 137, 145 n.5 (1987).

While Plaintiff cites heavily to the regulations in arguing that the ALJ erred at step two, her case-specific argument consists of a single conclusory paragraph [Entry #19 at 12] and she fails to cite to any evidence supporting the diagnosis of a psychotic impairment. A review of the evidence demonstrates that Plaintiff was repeatedly diagnosed with bipolar disorder and an affective/depressive disorder, but the record contains no diagnosis of schizophrenia, post-traumatic stress disorder, or any other psychotic disorder. While Plaintiff exhibited bizarre behavior in 2002 and 2007, these episodes were attributed to her bipolar disorder. *See* Tr. at 192, 200. Thus, Plaintiff has failed to meet her burden of proving that she suffers from a medically-severe psychotic impairment. Furthermore, Plaintiff's argument that the ALJ failed to acknowledge "the psychotic features of her mental illness" is without merit. At step two, the ALJ specifically referenced Plaintiff's involuntary commitment in December 2002. Tr. at 12. Thus, it is apparent that he considered this evidence in assessing Plaintiff's severe impairments. For these reasons, the undersigned recommends finding that the ALJ did not err in his step two determination.

b.    Step Three

Plaintiff next argues that the ALJ erred at step three by failing to consider whether Plaintiff met the requirements for Listing 12.03. Listing 12.03 applies to "Schizophrenic, Paranoid and other Psychotic Disorders." 20 C.F.R. pt. 404, Subpt. P, App. 1 § 12.03. As in initial matter, the undersigned recommends a finding that the ALJ was not required

16

to consider Listing 12.03 because the record does not contain any diagnosis falling within this Listing. Furthermore, and consistent with the record, Plaintiff's counsel asked that the ALJ consider Listing 12.04, but made no mention of Listing 12.03. Tr. at 48.

Plaintiff also argues that the ALJ's finding that the evidence failed to establish the presence of the "paragraph C" criteria is not supported by substantial evidence. [Entry #22 at 1 (identifying this as her central argument)]. Presumably, Plaintiff intends to assert this argument not only as to Listing 12.03, but also as to Listing 12.04, the listing that the ALJ explicitly considered at step three. Listing 12.04 addresses affective disorders and provides, in pertinent part, as follows:

> 12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.
>
> The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
>
> . . .
>
> C.   Medically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
>
> 1.   Repeated episodes of decompensation, each of extended duration; or
> 2.   A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or

17

3.    Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

20 C.F.R. pt. 404, Subpt. P, App. 1 § 12.04.

The ALJ found that the evidence failed to establish the presence of the paragraph C criteria.  Tr. at 14.  He noted that there was no medically documented history of a residual disease process resulting in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause Plaintiff to decompensate.  *Id.*  He further noted that there was no evidence of a current history of one or more years' inability to function outside a highly supportive living arrangement, with indication of continued need for such an arrangement.  *Id.*

Plaintiff asserts that she meets the paragraph C criteria because her inability to function outside of her home has persisted for at least two years.  [Entry #22 at 2].  She cites no case law to support the proposition that an alleged inability to function outside the home satisfies the paragraph C requirement of a "[m]edically documented history of a chronic affective disorder of at least 2 years' duration."  20 C.F.R. pt. 404, Subpt. P, App. 1 § 12.04C.  Furthermore, as the Commissioner argues, the ALJ specifically considered Plaintiff's need for a highly supportive living environment and found that there was not evidence "of a current history of 1 or more years' inability to function outside a highly supportive living arrangement."  *Id.* at 11 (citing Tr. at 14).

While the parties dispute what constitutes a "highly supportive living arrangement," the undersigned's review of the record does not reveal sufficient evidence of such a living arrangement regardless of the definition.  A record from May 2009 (after

18

Plaintiff's date last insured) notes that Plaintiff remained isolative with limited social contact outside of family. Tr. at 223. However, numerous records, both before and after the date last insured, document Plaintiff reporting that she was doing well. Tr. at 225, 227, 286–87, 289, 291. Plaintiff was also noted to have a bright or euthymic affect on several occasions. Tr. at 219, 274, 276. While Plaintiff reported that her sister checked on her about three times per week (Tr. at 31), she also reported living alone (Tr. at 29), attending church (Tr. at 225), cooking meals (Tr. at 230), caring for herself (Tr. at 176), doing household chores (Tr. at 172), and weaving baskets to earn money (Tr. at 172, 219, 223). In November 2008, Plaintiff reported socializing more. Tr. at 219. To find that Plaintiff lived within a highly supportive living arrangement under the facts presented here would undoubtedly open the flood gates for such assertions from any claimant who leaves her house infrequently and who has family members nearby who check on her. The undersigned finds such a reading of paragraph C unreasonably broad and, therefore, recommends a finding that the ALJ's conclusion that Plaintiff did not meet the paragraph C criteria to be supported by substantial evidence.

For the foregoing reasons, the undersigned recommends a finding that the ALJ did not err at steps two or three of the sequential evaluation process. [6]

---

[6] While Plaintiff did not allege in her opening brief that the ALJ erred in his RFC analysis, the Commissioner's response argues that the RFC analysis was supported by substantial evidence and Plaintiff's reply brief also touches on the issue. To the extent Plaintiff intends to argue that the ALJ erred at step four, the undersigned recommends a finding that the ALJ's RFC finding was supported by substantial evidence. While Plaintiff disputes the ALJ's treatment of the GAF scores in the record, she fails to identify any additional limitations that should have been included in the RFC. Furthermore, the RFC assessed by the ALJ takes into account Plaintiff's alleged

2.        Credibility Determination

Plaintiff next argues that the ALJ erred in his credibility analysis by failing to explain which statements he believed were not credible, failing to identify the symptoms he believed were not credible, and failing to consider the alleged psychotic nature of her mental illness and her highly supportive living arrangement.  [Entry #19 at 14].  The Commissioner responds that the ALJ properly evaluated Plaintiff's credibility in accordance with SSR 96-7p.  [Entry #21 at 15].

Prior to considering a claimant's subjective complaints, an ALJ must find a claimant has an underlying impairment that has been established by objective medical evidence that would reasonably be expected to cause subjective complaints of the severity and persistence alleged.  *See* 20 C.F.R. §§ 404.1529, 416.929; SSR 96-7p; *Craig*, 76 F.3d 585, 591–96 (4th Cir. 1996) (discussing the regulation-based two-part test for evaluating pain).  The first part of the test "does not . . . entail a determination of the intensity, persistence, or functionally limiting effect of the claimant's asserted pain."  76 F.3d at 594 (internal quotation omitted).  Second, and only after claimant has satisfied the threshold inquiry, the ALJ is to evaluate "the intensity and persistence of the claimant's pain, and the extent to which it affects her ability to work."  *Id.* at 595.  This second step requires the ALJ to consider the record as a whole, including both objective and subjective evidence, and SSR 96-7p cautions that a claimant's "statements about the intensity and persistence of pain or other symptoms or about the effect the symptoms

difficulties with social interaction and stressors by limiting her to working in essential isolation with only occasional supervision and no production-rate or paced work.  Tr. at 14.

20

have on his or her ability to work may not be disregarded solely because they are not substantiated by objective medical evidence." SSR 96-7p, ¶ 4.

If an ALJ rejects a claimant's testimony about her pain or physical condition, he must explain the bases for such rejection to ensure that the decision is sufficiently supported by substantial evidence. *Hatcher v. Sec'y, Dep't of Health & Human Servs*., 898 F.2d 21, 23 (4th Cir. 1989). "The determination or decision must contain specific reasons for the finding on credibility, supported by the evidence in the case record, and must be sufficiently specific to make clear to the individual and to any subsequent reviewers the weight the adjudicator gave to the individual's statements and the reasons for that weight." SSR 96-7p, ¶ 5. In evaluating the intensity, persistence, and limiting effects of an individual's symptoms and the extent to which they limit an individual's ability to perform basic work activities, adjudicators are to consider all record evidence, which can include the following: the objective medical evidence; the individual's ADLs; the location, duration, frequency, and intensity of the individual's pain or other symptoms; factors that precipitate and aggravate the symptoms; the type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; any measures other than treatment the individual uses to relieve pain or other symptoms; and any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. SSR 96-7p.

Here, after setting forth the applicable regulations, the ALJ considered Plaintiff's subjective claims under the required two-step process. *See Craig*, 76 F.3d at 591–96. The ALJ found Plaintiff's impairment could reasonably be expected to cause some of the symptoms she alleged, but determined that Plaintiff's statements "concerning the intensity, persistence and limiting effects" of her symptoms were "not credible to the extent" they were inconsistent with the ALJ's determination of her RFC.  Tr. at 16.

In discounting Plaintiff's credibility, the ALJ first summarized the medical evidence of record and found that the evidence did not indicate that Plaintiff's mental condition was as limiting as she alleged.  Tr. at 15–16.  In making his credibility determination, however, the ALJ did not rely solely on the lack of objective evidence.  As he is required to do, he cited additional reasons why Plaintiff's testimony was not credible.  *Mickles v. Shalala*, 29 F.3d 918, 921 (4th Cir. 1994).  He noted that the extent of Plaintiff's ADLs suggested that her symptoms were not as limiting as she alleged. Specifically, the ALJ cited to Plaintiff's reports that she weaves baskets for approximately seven hours a day, performs household chores, goes to the grocery store, and reads without difficulty.  Tr. at 16.

After noting the reasons that he did not find Plaintiff's statements to be fully credible, the ALJ identified several aspects of her testimony that he relied on in assessing her RFC.  Tr. at 17.  He stated that in light of Plaintiff's history of bipolar disorder and allegations of difficulty concentrating, he limited her to simple, routine, and repetitive tasks and found that she must avoid moderate exposure to excessive noise and vibration. *Id.*  He noted that he also gave deference to her testimony that she does not handle stress

22

well in finding that she could perform an occupation involving only occasional changes in the work setting and no production-rate or paced work. *Id.* Additionally, the ALJ stated that in light of Plaintiff's allegations that she had difficulty interacting and getting along with others, he found that she should be limited to working in essential isolation with only occasional supervision. *Id.* The ALJ then stated that based on the reasons he previously identified, he did not find her allegation of being incapable of all work activity to be credible. *Id.*

The ALJ's decision gives significant credence to Plaintiff's alleged functional limitations. To the extent the ALJ did not find Plaintiff to be fully credible, he provided valid grounds to discount her credibility. Consequently, the undersigned recommends a finding that the ALJ's credibility determination is supported by substantial evidence.

As part of her credibility argument, Plaintiff also contends that the ALJ did not properly weigh the testimony of her sister. [Entry #19 at 14]. Pursuant to SSR 96-7p, in determining the credibility of a claimant's statements, the ALJ must consider the entire case record including statements from "other persons about the symptoms and how they affect the individual." SSR 96-7p. Other persons may include non-medical sources such as spouses, parents, caregivers, siblings, other relatives, friends, neighbors, and clergy. 20 C.F.R. § 404.1513(d). These lay witnesses "may provide [statements] about how the symptoms affect [a claimant's] activities of daily living and [her] ability to work. . . ." 20 C.F.R. § 404.1529(a). Where a lay witness's testimony merely repeats the allegations of a plaintiff's own testimony and is likewise contradicted by the same objective evidence discrediting the plaintiff's testimony, specific reasons are not necessary for dismissing the

lay witness's testimony. *See Lorenzen v. Chater*, 71 F.3d 316, 319 (8th Cir. 1995); *Carlson v. Shalala*, 999 F.2d 180 (7th Cir. 1993); *Robinson v. Sullivan*, 956 F.2d 836, 841 (8th Cir. 1992); *Vincent v. Heckler*, 739 F.2d 1393, 1395 (9th Cir. 1984).

Although Plaintiff contends the ALJ did not properly weigh Ms. Managalt's testimony, the ALJ's decision belies Plaintiff's argument.  The ALJ stated that he considered the testimony and, while he found that it was generally credible, he gave little weight to Ms. Managalt's opinion that Plaintiff is incapable of all work activity because it is inconsistent with Plaintiff's essentially normal mental status examinations and the weight of the other evidence of record.  Tr. at 17.  Plaintiff has failed to identify what more the ALJ should have done in weighing Ms. Managalt's testimony.  Furthermore, the testimony, which is summarized above, is largely duplicative of Plaintiff's own testimony.  Thus, the ALJ was not required to provide specific reasons for dismissing the testimony.  With regard to Plaintiff's argument that the ALJ did not "fairly report the entirety of the testimony," the undersigned finds no such requirement in the regulations.  For the foregoing reasons, the undersigned recommends a finding that the ALJ did not err in his treatment of Ms. Managalt's testimony.

III.    Conclusion and Recommendation

The court's function is not to substitute its own judgment for that of the Commissioner, but to determine whether her decision is supported as a matter of fact and law.  Based on the foregoing, the undersigned recommends the Commissioner's decision be affirmed.

IT IS SO RECOMMENDED.

*Shiva V. Hodges*

December 18, 2013                          Shiva V. Hodges
Columbia, South Carolina              United States Magistrate Judge

**The parties are directed to note the important information in the attached
"Notice of Right to File Objections to Report and Recommendation."**

**Notice of Right to File Objections to Report and Recommendation**

The parties are advised that they may file specific written objections to this Report and Recommendation with the District Judge.  Objections must specifically identify the portions of the Report and Recommendation to which objections are made and the basis for such objections.  "[I]n the absence of a timely filed objection, a district court need not conduct a de novo review, but instead must 'only satisfy itself that there is no clear error on the face of the record in order to accept the recommendation.'"  *Diamond v. Colonial Life & Acc. Ins. Co.*, 416 F.3d 310 (4th Cir. 2005) (quoting Fed. R. Civ. P. 72 advisory committee's note).

Specific written objections must be filed within fourteen (14) days of the date of service of this Report and Recommendation.  28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b); *see*  Fed. R. Civ. P. 6(a), (d).  Filing by mail pursuant to Federal Rule of Civil Procedure 5 may be accomplished by mailing objections to:

Robin L. Blume, Clerk
United States District Court
901 Richland Street
Columbia, South Carolina 29201

**Failure to timely file specific written objections to this Report and Recommendation will result in waiver of the right to appeal from a judgment of the District Court based upon such Recommendation.**  28 U.S.C. § 636(b)(1); *Thomas v. Arn*, 474 U.S. 140 (1985); *Wright v. Collins*, 766 F.2d 841 (4th Cir. 1985); *United States v. Schronce*, 727 F.2d 91 (4th Cir. 1984).